**CITIBANK, NATIONAL ASSOCIATION, Plaintiff,**

v.

**Howard LONDON and Cynthia London, Defendants.**

**Civ. A. No. H–78–1531.**

United States District Court, S. D. Texas, Houston Division.

October 1, 1981.

Sidney Farr, Houston, Tex., for plaintiff.

Howard London, pro se.

Roy Beene, Houston, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Introduction

McDONALD, District Judge.

This is a breach of contract action by the plaintiff, Citibank National Association, against the defendants, Howard and Cynthia London, to recover the balance due on two written agreements executed in New York City on June 28, 1973. The plaintiff commenced this suit by invoking the diversity jurisdiction of this Court pursuant to 28 U.S.C. § 1332. The plaintiff alleges that the defendants have defaulted on debt payments due and owing under the terms of these agreements and that plaintiff is now entitled to judgment for the balance owed with interest. The defendants contend they owe nothing under the agreements in that the agreements were obtained by plaintiff through unlawful duress in which plaintiff coerced defendants into assuming a corporate debt. The defendants contend further that the plaintiff should be estopped from proceeding against them individually for recovery of a corporate debt. Finally, the defendants assert that the plaintiff's claim is barred by the statute of limitations. This action was tried without a jury. The parties submitted post-trial memoranda and proposed findings of fact and conclusions of law. After having considered the record, the testimony and demeanor of the witnesses, the exhibits, the arguments of the parties and the applicable law, the Court now enters its Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. Plaintiff, Citibank, National Association, is a national banking association organized under the laws of the United States commonly known as the National Banking Act. It is located in the City and State of New York.

2. Defendants Howard London and Cynthia London, who are married to one another, are both citizens of the State of Texas.

3. This is a breach of contract action by the plaintiff, Citibank National Association, against the defendants, Howard and Cynthia London, to recover the balance due on two written agreements executed in New York City on June 28, 1973.

4. One of the agreements, in question, is entitled "Affidavit of Confession of Judgment" and is signed by both defendants. The other agreement is entitled "Stipulation" and is signed only by Howard London.

Although the stipulation was not notarized, Howard London acknowledged the authenticity of his signature at trial.

5. When these written agreements were executed, the plaintiff was known as First National City Bank. Subsequently, but before this action was filed, First National City Bank changed its name to Citibank, National Association. For purposes of these Findings and Conclusions, the plaintiff will be referred to as either "Citibank" or "the bank." The defendants, Howard and Cynthia London, will be referred to individually as "Mr. London" or "Mrs. London" and jointly as "the Londons."

6. Briefly, the agreements state that the Londons received $55,182.79 from Citibank as a result of overdrafts on certain checking accounts maintained with the bank and controlled by the Londons, no part of which had been repaid on June 28, 1973.

7. The checking accounts on which the overdrafts occurred were maintained at Citibank by two companies owned and controlled by Mr. London. The names of these companies were Innographic Industries, Inc., and Atlex Industries, Inc. Mr. London was the president and sole stockholder of both corporations. The corporations were operated on an informal basis and maintained no board of directors. Mrs. London did not participate in the operation of the corporations. Neither one of these corporations is a party to this law suit.

8. Innographic, Inc., and Atlex, Inc. had a history of overdrafts on their Citibank checking accounts. The bank typically would cover these overdrafts for a few days, after which sufficient funds would become available to cover the checks. This practice was never officially approved by Citibank.

9. During June and July of 1972, Innographic, Inc., and Atlex, Inc. had a sharp increase in the amount and frequency of their overdrafts. During these two months, Citibank covered overdrafts in the amount of $55,182.79 on these corporate accounts.

10. The overdrawn accounts were referred to Arthur Lloyd, a vice president of Citibank, for collection. Mr. Lloyd utilized the services of a private investigator, Mr. McBride, to assist him in this matter.

11. Mr. Lloyd first met Mr. London in July of 1972. Mr. London attempted to reimburse the bank for the overdrafts, in question, by writing a check against an account he maintained at a bank in New Jersey. This check, however, was returned against uncollected funds. Consequently, the overdraft at Citibank was never covered.

12. In late July 1972, Mr. Lloyd referred this matter to the District Attorney of Queens County, New York. This referral was consistent with the bank's policy on collections.

13. In early August 1972, Mr. London's personal attorney met with Arthur Lloyd at Lloyd's office to generally discuss a settlement of Citibank's civil claim based on the overdrafts. Mr. London's attorneys proposed a settlement of $5,000 to be secured with a second mortgage. The bank rejected this proposal because it wanted more money up front. The evidence is unclear as to whether these discussions pertained only to the corporate accounts or whether they also pertained to Mr. London's personal account.

14. The evidence revealed that in January 1973 Citibank became suspicious that the Atlex Industries, Inc. account might have been involved in a "check kiting" scheme. (Plaintiff's Exhibit No. 4)

15. In March of 1973, a Queens County, New York, grand jury indicted Mr. London, Atlex Industries, Inc. and Innographic Industries, Inc. as joint defendants for grand larceny and issuing bad checks in connection with the overdrafts described above for the period of on or about July 7–July 19, 1972. Mr. Lloyd testified before that grand jury in late February 1973. Prior to this indictment, the bank never made any representation to Mr. London that they would seek an indictment.

16. Pursuant to the grand jury's indictment, Mr. London was arrested sometime in March 1973. On that same day his wife posted bond and he was released.

17. Mr. London's attorney continued settlement negotiations with the bank after the indictment was issued.

18. In April of 1973, the District Attorney of Queens County contacted Mr. Lloyd to inquire whether Citibank would object to a dismissal of the indictment against Mr. London, if Mr. London offered restitution of the underlying debt which the bank sought to collect. Consistent with an informal company policy, Mr. Lloyd responded to the inquiry by saying any dismissal of the indictment would be within the sole discretion of the District Attorney's office.

19. Although Mr. Lloyd had no further personal contact with the Queens County D.A. after that April phone call, Mr. McBride apparently communicated with the D.A. subsequent to this time: these communications would not have been at Mr. Lloyd's direction.

20. Citibank never attempted to recover all or part of the $55,182.79 in overdrafts from the assets of Innographic Industries, Inc. or Atlex Industries, Inc. Virtually no evidence was introduced to establish whether or not these corporations had assets from which Citibank could have recovered all or part of the indebtedness. Citibank held no collateral pledged by Innographic, Inc., and in July 1973 there was a foreclosure sale of Innographic's assets. These assets, however, were distributed to secured creditors, of which the plaintiff was not one. Pursuant to subsequent bankruptcy proceedings Mr. London was held liable for certain debts of his corporation.

21. Citibank never filed any civil charges against either Innographic, Inc., Atlex, Inc., or Mr. London, until this action was brought against the Londons.

22. In a letter dated May 31, 1973, Arthur Lloyd forwarded photocopies of the statements of accounts for Atlex Industries, Inc. and Innographic Industries, Inc. to Mr. London's attorney, Mr. Kirschner. In that letter Mr. Lloyd advised Mr. London's attorney that the bank expected to receive restitution (Defendants' Exhibit No. 3).

23. The trial testimony established, and the plaintiff so acknowledged, that Mrs. London had no communications with Mr. Lloyd, or any other Citibank representative. Mrs. London testified, and the Court so finds, that she knew nothing about the underlying facts which resulted in the check overdrafts; Mr. London had merely informed her that he was experiencing trouble covering checks. Mrs. London only became aware of the serious nature of the check overdrafts when Mr. London was arrested in March 1973.

24. Mr. London's scheduled arraignment on the March 1973 grand jury indictment, was June 28, 1973.

25. On or about June 27, 1973 Mr. London and his attorney met with Arthur Lloyd at the office of Mr. London's attorneys, for the purpose of negotiating a final settlement of Citibank's civil claim for the overdrafts. The final written draft of the settlement consisted of the "Affidavit of Confession of Judgment" and the "Stipulation." These settlement papers were originally drafted by Mr. Lloyd and later revised by Mr. London's attorney. These instruments were executed on June 28, 1973.

26. The "Affidavit of Confession of Judgment," hereinafter "the affidavit," states that during June and July of 1972 the Londons received from First National City Bank, $55,182.79 as a result of overdrafts in certain checking accounts maintained with plaintiff and controlled by the defendants, no part of which had been repaid on the date of the instrument. This instrument contains no provision for interest charges.

27. In the "Stipulation" Howard London acknowledges that during June and July of 1972 he received, from First National City Bank, for his own benefit or the benefit of corporations controlled by him, the sum of $55,182.79 as a result of overdrafts in accounts controlled by him, no part of which had been repaid. In that same stipulation, Mr. London agrees to repay the entire $55,182.79 to Citibank by delivery of $25,000 in cash contemporaneously with the execution of the stipulation and the balance

of $30,182.79 with interest at 7½ per annum from July 15, 1972 in equal consecutive monthly installments of $500.00 each beginning on October 1, 1973 and continuing on the first day of each month thereafter until paid. Moreover, the stipulation provides that upon default the bank may enter judgment against Mr. London for any balance due and owing.

28. Mr. London signed both the affidavit and the stipulation at his attorney's office in the presence of his attorney and a Citibank representative. Neither Mr. Lloyd nor Mrs. London were present. Mr. London signed these instruments on his attorney's advice that it was in Mr. London's own best interest to personally assume the corporate obligation for the overdrafts. In the words of Mr. London, his attorney convinced him that signing the affidavit and stipulation "was the wisest action for [him] to take at that time." (Deposition of Howard London p. 26)

29. Mrs. London was made a party to the Affidavit of Confession of Judgment on the advice of Mr. London's attorneys. Mrs. London signed this instrument at her home after Mr. London presented it to her and requested her signature. Mrs. London thought she was asked to sign the affidavit because the instrument required two signatures. Mrs. London believed by signing the affidavit, Mr. London would avoid prosecution on the grand jury indictment. The evidence established that Mrs. London was totally unware of the underlying events and negotiations which resulted in the execution of the affidavit. Apparently her signature appears on that document merely because her husband asked her to sign it.

30. On June 28, 1973 Mr. London met with his attorneys at their office to arrange for the delivery of the $25,000 payment to Citibank called for under the terms of the stipulation. Later that morning Mr. London's attorneys met with the Queens County D.A. and Mr. McBride in the chambers of Queens County Judge Albert Bosch to discuss the pending indictment against Mr. London. After this conference, Judge Bosch, called the case of the *People of the State of New York v. Howard London, Atlex Industries, Inc. and Innographic Industries, Inc.*, and dismissed the indictment and charges against Howard London. A plea of guilty was entered by the corporate defendants which were then defunct.

31. The Affidavit of Confession of Judgment was never filed with any clerk or court within three years after its execution, as is required by New York law.

32. After delivery of the $25,000 cash payment, Howard London had a residual obligation of $32,918.09, under the terms of the stipulation. This figure represented $30,182.79 ($55,182.79 – $25,000), plus $2,735.30 in interest thereon at 7½ per annum from July 15, 1972—October 1, 1973. (*See* Plaintiff's Exhibit 2 and 5)

33. This obligation was subsequently reduced by two October 2, 1973 checks, totalling $4,043.68 from the sale of First Investors Fund for Growth Stock ($908.00) and Anchor Growth Fund, Inc., stock ($3,135.68), the proceeds of which are represented by two First Pennsylvania Bank checks of that date. (Defendants' Exhibit No. 5) While the bank contends that that sum should be credited on a different debt owed by Mr. London, the evidence introduced does not persuade the Court that this is correct. Indeed the terms of the stipulation state that the sum should be applied in reduction of the residual obligation discussed above. Since there is no exhibit in evidence allocating those two payments, the Court finds that the $4,043.68 should be applied *in toto* to reduction of the $32,918.09 principal balance, that being the most favorable allocation possible to Mr. London. This left a principal balance of $28,874.41 on October 10, 1973.

34. By a series of payments beginning on or about October 10, 1973, and ending on or about May 9, 1977, Howard London paid Citibank a total of $18,520.52, pursuant to the terms of the stipulation. (*See* Plaintiff's Exhibits No. 3 and 5) There is conflicting documentary evidence regarding the proper allocation of these payments to the reduction of principal and interest.

35. Plaintiff's Exhibit No. 5 reveals that the $18,520.52 was applied *in toto* to reduction of principal, save the initial $2,735.30 interest charge. In addition, two letters from Citibank to Mr. London, one dated August 26, 1975 and the other dated January 13, 1977, indicate that the bank applied Mr. London's entire payments toward the reduction of principal. (*Compare* Defendants' Exhibit No. 6 and Plaintiff's Exhibit No. 6 with Defendants' Exhibit No. 5) The bank, however, asserts that the balance due figures stated in these letters were erroneous, because the figures only reflected the balance that would have been owed had no interest obligation been created under the stipulation. It is the bank's position that the stipulation provides for an interest charge of 7½ on each monthly balance. This interpretation is consistent with the Court's finding that the stipulation provided for 7½ interest on the initial balance of $30,182.79 from July 15, 1972 to October 1, 1973. (*See* Finding No. 32)

36. Apparently Plaintiff's Exhibit No. 5 was merely a ledger, on which a Citibank clerk noted the date and amount of Mr. London's payments. The ledger was not designed to reflect the amount of interest accrued or the proper allocation of payments to principal and interest.

37. The evidence was clear that Citibank treated the overdrafts in question as a "loan" to Mr. London and they followed the standard banking practice of charging interest on that "loan." (Plaintiff's Exhibits 2 and 3)

38. There was circumstantial evidence that Mr. London's attorneys negotiated a "deal" with the Queens County prosecutor, under which the latter agreed to dismiss the pending indictments against Mr. London if Mr. London worked out a mutually satisfactory agreement with Citibank resolving the latter's civil claim for the overdrafts. There was no evidence that Citibank was actually a party to this "deal," or that the bank agreed to see that the pending criminal proceeding against Mr. London would be dismissed if the Londons signed the two documents in litigation. There was some hearsay evidence, however, that Mr. McBride, the private investigator retained by Mr. Lloyd, was well aware of both the status of the criminal proceeding against Mr. London and the settlement negotiations between Citibank and Mr. London's attorneys.

39. Nevertheless, the Court finds that the evidence clearly establishes that at every stage of the negotiations leading up to the execution of the affidavit and stipulation Howard London was represented by competent counsel and he was fully aware and capable of exercising his options.

40. By signing the stipulation Howard London acknowledged, that he had received $55,182.79 from Citibank for the benefit of himself and/or his corporations. Mr. London's trial testimony clearly established that he and his attorneys were fully aware of the difference between a personal and corporate obligation at the time the stipulation was signed.

41. Mr. London made payments pursuant to the stipulation, for 3½ years without ever protesting that his execution of that document or the affidavit was induced by coercion or duress on the part of Citibank. In fact Mr. London renegotiated the terms of his payment schedule at least once during that 3½ year period. (Plaintiff's Exhibit No. 6)

42. The Londons moved to Houston, Texas in or about July 1977. Howard London failed to make any further payments to Citibank after he moved to Houston; his last payment was on May 9, 1977. Mr. London discontinued his payments because he felt he could no longer afford them, and he felt he had been ill-advised to personally assume corporate obligations. Mr. London never advised Citibank that he would be discontinuing his payments.

43. The evidence was not clear as to the proper allocation of Mr. London's $18,520.52 payment to the reduction of principal and interest.

Plaintiff's Exhibit No. 3 represented a schedule which allocated payments between principal and interest reduction, however, it

reflected an incorrect starting balance on October 10, 1973 of $30,182.79. This figure failed to reflect Mr. London's $4,043.68 payment received by the bank on or about October 2, 1973. (*See* Finding of Fact No. 32 and 33)

The plaintiff submitted a "revised Exhibit No. 3", to supplement its post-trial proposed findings of fact, which reflected a starting balance of $26,139.11. This revised payment schedule properly credited the defendant's $4,043.68 payment yet it failed to include the $2,735.30 in interest charges for the period of July 15, 1972—October 1, 1973. (*See* Finding of Fact No. 32)

Consequently, there is no payment schedule in the record which accurately reflects either the actual starting balance of $28,-874.41 (*See* Finding of Fact No. 33), the proper allocation of Mr. London's payments to the reduction of principal and interest, or the principal amount due and owing after Mr. London made his last payment on May 9, 1977.

44. After proper credit for all payments, the Court finds that under the terms of the stipulation, Mr. London still owes Citibank an unpaid principal balance plus unpaid interest on that balance at 7½% per annum from May 9, 1977 to the date on which judgment is entered herein. There is no exhibit, however, which accurately reflects the principal balance due and owing on May 9, 1977.[1]

## CONCLUSIONS OF LAW

1. The Court's jurisdiction over this action is based upon diversity of citizenship. 28 U.S.C. § 1332(a)(1). The parties to this action are residents of Texas and New York and the amount in controversy exceeds $10,-000.00. A federal court sitting in diversity must follow the choice of law provisions of the forum state. *Day & Zimmerman v. Challoner*, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Klaxon v. Stentor Elec-*

*tric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

2. The plaintiff's action sounds in contract. Texas courts continue to adhere to the well settled *lex loci contractus*[2] rule in determining applicable law in contractual disputes, whereby the validity and interpretation of a contract are determined by the law of the state where the contract is made and to be performed. 12 Tex.Jur.3d, Conflict of Laws § 9; *Austin Building Co. v. National Union Fire Ins. Co.*, 432 S.W.2d 697 (Tex.1968).

3. Here, the cause of action arose in New York and the two instruments in question were both executed and performable in New York. Consequently, the law of New York governs the substantive issues in this lawsuit. *Day & Zimmerman, Inc. v. Challoner, supra; State of California v. Copus*, 158 Tex. 196, 309 S.W.2d 227, 230, *cert. denied*, 356 U.S. 967 (1958).

4. Under New York statutory law, a judgment by confession is a procedural device which enables a creditor to secure entry of a judgment against his debtor before the debt is due: execution on judgment may not be levied until the due date. *New York Civil Practice Law & Rules*, § 3218; CPLR § 3218, Prac.Comm., C3218:1, Siegel, McKinney's Cons.Laws, Book 7B. *See Mall Commercial Corp. v. Chrisa Restaurant, Inc.*, 85 Misc.2d 613, 381 N.Y.S.2d 391 (1976). The execution of an affidavit of confession of judgment is a prerequisite to obtaining a judgment of confession. A judgment by confession may be used when a debt is presently due and owing; the requisite papers drawn up and filed for an existing liability. In such an instance the confession of judgment is really being used as a short cut to a judgment in a case where the defendant concedes liability. *See Alland v. Consumers Credit Corporation*, 476 F.2d 951, 957 (2nd Cir. 1973). The case at bar fits this description.

---

1. Refer to Conclusion of Law No. 29 *infra*.

2. In some instances, this Circuit has applied the Texas choice of law rule doctrine of *lex loci contractus* consistently with the "most significant relationship" test expressed in the Re-

statement (Second) of Conflicts. *See e. g., Dailey v. Transitron Electronics Corp.*, 475 F.2d 12 (5th Cir. 1973); *Teas v. Kimball*, 257 F.2d 817, 823–24 (5th Cir. 1958).

5. Here, the plaintiff negotiated an agreement with Howard London, the terms of which were set forth in the instrument entitled "Stipulation." One of the terms of the stipulation, executed by Mr. London, authorized Citibank, in the event of a default in payments under the stipulation, to enter a judgment against Mr. London for any balance due on the stipulation. The only means available to implement that remedy was the contemporaneous affidavit of confession of judgment signed by both Mr. and Mrs. London. *See Continental Casualty Company v. Roche*, 233 N.Y.S.2d 719 (1962); *Granville v. Gratzer*, 200 Misc. 738, 105 N.Y.S.2d 607, *rev'd on other grounds*, 281 A.D. 514, 120 N.Y.S.2d 797 (1953).

■ 6. Judgments by confession are governed entirely by CPLR § 3218,[3] and strict conformity with the statutory provisions is requisite. *American Cities Co. v. Stevenson*, 187 Misc. 107, 60 N.Y.S.2d 685 (1946); *Williams v. Mittlemann*, 259 App. Div. 697, 20 N.Y.S.2d 690 (1940). *But see, Reliance Insurance Company v. Brown*, 59 A.D.2d 968, 399 N.Y.S.2d 286, 288 (1977).

■ 7. New York statutory law requires the affidavit of confession of judgment to be filed, with the clerk of the county court in which judgment is to be entered, within three years of the date on which the affidavit is executed. *New York Civil Practice Law & Rules* § 3218(b). Where the terms of the confession of judgment preclude entering the affidavit and judgment until default occurs, these instruments should not be filed until then. If the affidavit and judgment are filed and entered before default, execution may not issue on the judgment until a default occurs. CPLR § 3218, Prac.Comm., C3218:13, Siegal McKinney's Cons.Laws. Book 7B. A properly entered judgment by confession would be entitled to full faith and credit in this Court. *Shaps v. Union Commerce Bank*, 476 S.W.2d 466, 468 (Civ.App.1972, no writ).

■ 8. The affidavit which confesses judgment is not a judgment but merely authority for entry of judgment. *Continental Casualty Company v. Roche, supra* at 720. Filing and entry of the affidavit are prerequisite to obtaining any judgment based thereon. *Steward v. Katcher*, 283 A.D. 50, 126 N.Y.S.2d 290 (1953); *Bloom v. Kapps*, 73 N.Y.S.2d 325, 329 (1947).

■ 9. It is undisputed that the plaintiff failed to properly file the Londons' affidavit of confession within three years of the date on which it was executed. Citibank also failed to make any attempt to file the affidavit upon default. The plaintiff has conceded and the Court so holds, that the bank failed to preserve its right to take a judgment by confession against the Lon-

---

**3.** Civil Practice Law and Rules § 3218, provides in part:

§ 3218. Judgment by confession

(a) Affidavit of defendant. Except as provided in section thirty-two hundred one, a judgment by confession may be entered without an action, either for money due or to become due, or to secure the plaintiff against a contingent liability in behalf of the defendant, or both, upon an affidavit executed by the defendant.

1. stating the sum for which judgment may be entered, authorizing the entry of judgment, and stating the county where the defendant resides or, if he is a non-resident, the county in which entry is authorized;

2. if the judgment to be confessed is for money due or to become due, stating concisely the facts out of which the debt arose and showing that the sum confessed is justly due or to become due; and

3. if the judgment to be confessed is for the purpose of securing the plaintiff against a contingent liability, stating concisely the facts constituting the liability and showing that the sum confessed does not exceed the amount of the liability.

(b) Entry of judgment. At any time within three years after the affidavit is executed, it may be filed with the clerk of the county where the defendant stated in his affidavit that he resided when it was executed or, if the defendant was then a nonresident, with the clerk of the county designated in the affidavit. Thereupon the clerk shall enter a judgment in the supreme court for the sum confessed. He shall tax costs to the amount of fifteen dollars, besides disbursements taxable in an action. The judgment may be docketed and enforced in the same manner and with the same effect as a judgment in an action in the supreme court. No judgment by confession may be entered after the defendant's death.

dons. *American Cities Co. v. Stevenson, supra.*

██ 10. In this connection, the plaintiff contends that this action is not a suit on a judgment taken by confession. Instead, Citibank has brought this suit as a breach of contract action; the contract being embodied in the stipulation signed by Mr. London. The Court concludes that this is a valid theory of recovery. *Cf. Reliance Insurance Company v. Brown, supra* (failure to file the affidavit did not extinguish underlying debt); *Continental Casualty Co., supra* (duly executed confession of judgment not entered in any court, did not bar creditor's action); *Shenson v. I. Shainin & Co.,* 243 A.D. 638, 276 N.Y.S. 881 (1935) (unverified confession of judgment not void as between parties signing it.)

██ 11. The stipulation signed by Mr. London is enforceable against him simply as a written contract. Mrs. London, however, did not sign the stipulation nor is Citibank entitled to obtain a judgment by confession against her on the basis of the affidavit. The evidence adduced at trial failed to establish the existence of any obligation due and owing Citibank by Mrs. London. The Court concludes, therefore, that the plaintiff failed to establish a basis of recovery against Mrs. London.

12. The stipulation is actually a contract between Citibank and Howard London, whereby the latter promised to repay monies received from Citibank, for his benefit or the benefit of his corporations. (Plaintiff's Exhibit No. 2)

██ It is well settled that in order for a promise to be enforceable as a contract, the promise must be supported by valid consideration. J. Calamari & J. Perillo, *Contracts,* § 4–1 at 133 (2nd Ed. 1977) [herein "Calamari"] The essence of consideration is a legal detriment that has been bargained for and exchanged for the prom-

ise. In short, the detriment must induce the promise. *Id.* at 134–135.

██ 13. The general rule is that past consideration is not consideration. *Pershall v. Elliot,* 249 N.Y. 183, 163 N.E. 554, 556 (1928); *Calamari* § 5–2, p. 178. A promise supported by past consideration is unenforceable because the detriment did not induce the promise. That is, "since the detriment had already been incurred, it cannot be said to have been bargained for in exchange for the promise." *Calamari* § 4–2, p. 135. Authorities are split on the question of whether a pre-existing debt is adequate (past) consideration for a promise to pay the debt. *See* 1A Corbin §§ 211, 212; 1 Williston § 143.

14. Under New York statutory law, a written promise expressing past consideration is given effect as a valid contractual obligation. N.Y. Gen.Oblig. § 5–1105 (McKinney's).[4] *See American Bank & Trust Co. v. Lichtenstein,* 48 A.D.2d 790, 369 N.Y.S.2d 155, 157–158 *aff'd* 39 N.Y.2d 857, 386 N.Y.S.2d 215 (1975); *Central State Bank v. Botwin,* 66 Misc.2d 1085, 323 N.Y. S.2d 74, 77 (1971) *rev'd on other grounds,* 71 Misc.2d 1012, 337 N.Y.S.2d 856 (1972). *But see Dick v. Dick,* 355 A.2d 110, 167 Conn. 210 (1974).

██ 15. In order for the plaintiff to recover for a breach of contract, under § 5–1105, the written agreement must contain an unequivocal promise to pay a sum certain, at a date certain, and must express consideration for the promise. *Sarama v. John Mee, Inc.,* 102 Misc.2d 132, 422 N.Y. S.2d 582 (1979). The plaintiff has established those elements here. Under the terms of the stipulation, Howard London made an unequivocal promise to pay Citibank $55,182.79 (plus interest), in monthly installments of $500.00; he promised this in consideration of the financial accommodations Citibank rendered him with respect to

---

**4.** § 5–1105. Written promise expressing past consideration

A promise in writing and signed by the promisor or by his agent shall not be denied effect as a valid contractual obligation on the ground that consideration for the promise is past or executed, if the consideration is expressed in the writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed.

the overdrafts. At trial, it was uncontroverted that this sum of money was actually received from Citibank for the benefit of one or both of Howard London's corporations.

16. Citibank therefore clearly established that it had a valid contract with Howard London, pursuant to § 5–1105 of New York's General Obligation's Law. Howard London subsequently breached this contract when he defaulted on the payments required under the terms of the stipulation.

17. In addition, or in the alternative, Howard London's promise, to make restitution of the $55,182.79 debt incurred by one or both of his corporations, was supported by Citibank's consideration of forbearing on any civil action they would have been entitled to bring. *See Central State Bank v. Botwin, supra*; 1 Corbin, *Contracts*, § 139. Under New York law, a party's forbearance which is impliedly bargained for constitutes sufficient consideration for a promise. *Richman v. Brookhaven Servicing Corp.*, 80 Misc.2d 563, 363 N.Y. S.2d 731, 734 (1975). Here, Citibank apparently forbore pursuing its civil remedies against Howard London and his corporations in reliance on Mr. London's promise that he would repay the money Citibank "loaned" him by covering the overdrafts. This act constitutes sufficient consideration.

18. Howard London contends that he should be relieved of his obligations under the stipulation, because that agreement was obtained under the duress of an indictment and coercive threats of criminal prosecution by the plaintiff. The underlying facts of this case do support the defendant's affirmative defense.

19. The civil injury resulting from a crime may be the subject of a valid agreement between the injured party and the party committing the crime, if the agreement contains no express or implied understanding that the party committing the crime will not be prosecuted for it or that a pending criminal prosecution will be stifled or suppressed. This rule includes agreements for restitution of property obtained by criminal conduct. *Seneca Falls Firemen's Ass'n v. Irland*, 100 N.Y.S.2d 502, aff'd 277 A.D. 1016, 99 N.Y.S.2d 1017 (1950); 10 N.Y. Jur., Contracts § 165, p. 63. Threats to resort to civil proceedings or to legal remedies does not constitute duress. It is never duress to threaten to do what one has a legal right to do. *Fidelity & Casualty Co. of New York v. United States*, 490 F.2d 960, 966 (Ct.Cl.1974). *Faske v. Gershman*, 30 Misc.2d 442, 215 N.Y.S.2d 144 (1961).

20. In order for a party to avoid a contract on the defense of duress, the party must establish that it was forced to agree to the contract by means of a wrongful threat precluding the exercise of its free will. *Austin Inst., Inc. v. Loral Corp.*, 29 N.Y.2d 124, 324 N.Y.S.2d 22, 272 N.E.2d 533 (1971). Moreover, it is not sufficient to establish that threats were uttered, but it must also be shown that those threats constrained the will of the promisor (London) and induced the promise. *In Matter of Revette*, 97 Misc.2d 699, 413 N.Y.S.2d 945, 948 (1977).

21. In the case at bar there was no evidence in the record to support a conclusion that Citibank threatened Howard London with criminal prosecution, in order to induce him into signing the stipulation. London testified repeatedly, and the Court so finds, that he signed the stipulation on the advice of his lawyer who in fact had been negotiating a settlement with the bank for almost one year before the stipulation was executed. Although, the indictment against Mr. London was dismissed as soon as the stipulation was executed, the evidence indicates that this was an arrangement worked out between Mr. London's attorneys and the prosecutor; the prosecutor has little incentive to prosecute a larceny charge when the offending party has agreed to restitution. Furthermore, the alleged threats of a stranger to a contract, have been held to be insufficient to support a claim of duress between contracting parties. *Citibank, N.A. v. Graphic Scanning Corp.*, 459 F.Supp. 337, 341 n. 3 (S.D.N.Y. 1978).

22. Whatever motivation induced Howard London to sign the stipulation, his signature on that document was not induced by duress or coercion on the part of the bank so as to bar the bank from recovery on the stipulation.

23. In any case, a contract procured by duress is not void, but voidable. A party who seeks to avoid a contract on that contention must act promptly to assert it, else he will be deemed to have waived it or ratified the contract. *Bethlehem Steel Corp. v. Solow*, 63 A.D.2d 611, 405 N.Y.S.2d 80 (1978). Unless rescinded, a voidable contract imposes the same obligation as a contract which is not voidable. *Matter of Fresh Meadows Jewish Center*, 75 A.D.2d 814, 427 N.Y.S.2d 476 (1980). By making payments under the stipulation from 1973 until 1977, without protest, Howard London waived his asserted defenses of duress and coercion.

24. Accordingly, the stipulation constitutes an enforceable contract under which Howard London was obligated to perform.

25. The defendant's contention that the plaintiff's claim is barred by the statute of limitations, is unfounded. Under the Texas conflict of laws rule, statutes of limitations are matters of procedural rather than substantive law, therefore the limiting statute of the forum prevails. *Culpepper v. Daniel Industries, Inc.*, 500 S.W.2d 958 (Civ. App.1973), writ ref. n.r.e.; 12 Tex.Jur.3d Conflict of Laws § 18 p. 324.

26. The statute of limitations that applies here is Article 5527 of the Revised Civil Statutes of Texas, which provides that actions for debt evidenced by a contract in writing must be commenced within four years after the cause of action accrues.[5] This cause of action accrued on May 9, 1977, the last date Howard London made a payment.

27. Under New York law, partial payment on a debt tolls the statute of limitations. 36 N.Y.Jur., Limitations and Laches § 143; *In re Melia's Estate*, 98 N.Y. S.2d 941, 945 (1950). Under the Texas conflict of laws rule, the Court must look to New York law to determine what effect partial payment of a debt, incurred and payable in New York, will have on the Texas four year statute of limitations. *Butler v. Merchants National Bank of Mobile*, 325 S.W.2d 229, 231 (Civ.App.1959). Since the last payment on the debt was made on May 9, 1977, the statute of limitations on the contract began to run anew on that date.

28. The bank had no obligation, before filing this action against the Londons, to try to collect the $55,082.79 in overdrafts from the two corporations Innographic Industries, Inc., and Atlex Industries, Inc. The terms of the stipulation specifically stated that Howard London personally assumed the debts of these corporations. Mr. London would like this Court to decline enforcement of his contractual agreement on the ground that his attorneys ill-advised him to personally assume corporate debts. This, the Court cannot do.

29. Under the above findings and conclusions, the plaintiff is entitled to recover judgment against Howard London for the outstanding principal plus interest thereon at 7½% per annum from May 9, 1977, to the date of judgment. Since the Court has determined that none of the exhibits introduced at trial reflect the correct principal owed as of May 9, 1977, the parties are directed to submit revised figures consistent with these findings within fifteen (15) days of the entry of this Order.

30. In the event that any of the foregoing Findings of Fact also constitute Conclusions of Law, they are adopted as such. In the event that any of the foregoing Conclusions of Law also constitute Findings of Fact, they are adopted as such.

---

5. Article 5527 provides in part:

There shall be commenced and prosecuted within four years after the cause of action shall have accrued, and not afterward, all actions or suits in court of the following description: 1. Actions for debt where the indebtedness is evidenced by or founded upon any contract in writing.

The Clerk shall file these Findings and provide a true copy to counsel for all parties and the defendant, Howard London.